UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

       Plaintiff,

                                          Case No. 10-20338

v.                                         Honorable Paul D. Borman
                                         United States District Judge

ENRIQUE AMAYA, D2
JESUS DANIEL MEDINA-MERAZ, D4

       Defendants.

_____/

**OPINION AND ORDER
(1) DENYING DEFENDANT MEDINA-MERAZ'S MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE (DOCKET 184)
(2) DENYING DEFENDANT AMAYA'S MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE (DOCKET 219)**

This matter is before the Court on Defendant Medina-Meraz's Motion to Suppress Fruits of Electronic Surveillance and for an Evidentiary Hearing (Dkt. 184) and Defendant Amaya's Motion to Suppress Fruits of Electronic Surveillance and for Evidentiary Hearing (Dkt. 219). The government filed a response (Dkt. 277). The Court held a hearing on March 19, 2012. For the reasons that follow, the Court DENIES Defendant Medina-Meraz's Motion to Suppress and DENIES Defendant Amaya's Motion to Suppress.

1

I.  INTRODUCTION

As part of an ongoing investigation into narcotics distribution, the government submitted three applications for authorization to intercept wire communications: October 5, 2009, for Victor Hugo Medina's[1] cellular telephone (Target Telephone 1); November 4, 2009, for an extension on Victor Medina's cellular telephone; and May 13, 2010, for Defendant Amaya's cellular telephone (Target Telephone 2). All three applications were accompanied by affidavits authored by Special Agent (SA) Michael Jeneary of the Drug Enforcement Administration (DEA). United States District Judge Lawrence P. Zatkoff and/or Judge Bernard Friedman entered Orders authorizing the wiretap intercepts.

Because SA Jeneary had heard Defendant Amaya speak Spanish on the wiretap of Victor Hugo Medina, Jeneary arranged for the use of private contract interpreters to assist the monitoring DEA agents on the wiretap of Defendant Amaya.

Over the course of the of the initial Victor Hugo Medina wiretap, there were 573 "voice sessions." A "voice session" is any time a cellular telephone actually connects to the system, whether for an incoming call or when the "send" button is pressed, and is counted regardless of whether an actual connection is made. Of the 573 "voice sessions," 94 calls were minimized. The extension of the Victor Hugo Medina wiretap had a total of 543 "voice sessions," with 67 calls being minimized.

---

[1] Victor Hugo Medina is referred to hereafter as "Medina" or "Victor Hugo Medina". Defendant Jesus Daniel Medina-Meraz will be referred to as "Defendant Medina-Meraz".

Over the course of the Defendant Amaya wiretap, there were 1,216 "voice sessions." Of the 1,216 "voice sessions" during the Amaya wiretap, 690 were "voice sessions" that were not just unanswered calls or calls transferred to voicemail where the caller did not leave a message. Of these 690 "voice sessions," 62 calls were minimized.

## II. ANALYSIS

### A. Necessity Requirement

The necessity requirement of Title III mandates that the application for the wiretap include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The purpose of the necessity requirement is "simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (citations omitted). "All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigator's belief that such non-wiretap techniques have been or will likely be inadequate. *United States v. Haque*, 315 F. App'x 510, 518 (6th Cir. 2009) (quoting *United States v. Alfano*, 838 F.2d 158, 163-64 (6th Cir. 1988)). A review of the instant affidavits provides ample evidence that SA Jeneary adequately informed the issuing judge of the difficulties involved in the use of conventional investigative techniques. Moreover, the determination of the judge issuing the electronic surveillance order is to be given "great deference." *United States v. Smith*, 395 F.App'x 223, 228 (6th Cir. 2010) (quoting *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000)).

### 1. October 5, 2009 Affidavit[2]

SA Jeneary's October 5, 2009 affidavit in support of the application for the wiretap of Target Telephone 1 lists the traditional investigative techniques that had previously been utilized: confidential sources, physical surveillance, obtaining cell detail and cell site records for Target Telephone 1 and 2, acquisition of precise location data for Target Telephone 1 and 2, administrative subpoenas, and/or court orders. The affidavit also identifies other traditional investigative techniques that were considered: trash pulls, grand jury investigation, interviewing subjects or associates, the serving of search warrants, utilizing undercover officers, and controlled delivery of narcotics.

Although confidential sources were being used, SA Jeneary stated that the information available to the confidential sources was limited based on the sources' positions within the criminal organization. Additionally, DEA Detroit did not have any way of infiltrating the criminal organization with an undercover agent.

SA Jeneary represented that agents attempted to conduct physical surveillance utilizing the Global Positioning System (GPS) location data obtained from Victor Hugo Medina's telephone. The agents were unsuccessful in physically locating Victor Hugo Medina until an attempt to locate him on September 8, 2009. On that occasion, Victor Hugo Medina detected the surveillance units and discontinued using that telephone.

---

[2] Although the wiretap was for Victor Hugo Medina's cellular telephone, Defendant Medina-Meraz has standing to challenge the evidence obtained from the wiretap because Defendant Medina-Meraz's calls were intercepted, and therefore he is an aggrieved person. *See* 18 U.S.C. § 2510(11).

SA Jeneary stated he considered a trash pull at Victor Hugo Medina's likely address, but deemed it unlikely to succeed. Based upon his experience and training, SA Jeneary knew that high-level drug traffickers typically do not dispose of incriminating evidence in their trash containers. Additionally, the house in question is located on a dead-end street with little traffic, so a trash pull posed a larger than usual risk of detection by the targets. Additionally, SA Jeneary believed that the trash pull might identify the wrappings used to transport narcotics, but it would not provide information as to who was transporting the narcotics, who was distributing the narcotics, or where the narcotics were being stashed.

SA Jeneary considered convening a grand jury investigation, but determined that it would not be successful in exposing the full nature and scope of the criminal activity. As with search warrants and interviews, convening a grand jury would alert the targets to the investigation, thereby jeopardizing the investigation.

The affidavit stated that the use of search warrants and interviews was premature at that time. The DEA was investigating a large criminal organization, and the execution of search warrants, or interviews of targets or their friends or associates or neighbors would alert the targets to the investigation.

SA Jeneary stated that a controlled delivery of narcotics would not succeed in the investigation of the criminal organization because the controlled delivery would only supply agents with probable cause to search a limited area at a limited time. Further, carrying out the search incident to the controlled delivery would frustrate the purpose of the investigation, which was to dismantle the entire criminal organization.

SA Jeneary concluded, based upon the toll analysis of the Target Telephones and other information, that the organization sold large quantities of narcotics, made large amounts of money, and covered a large area of geography. The Court concludes that Jeneary's representation to the court, that only through the interception of wire communications could the full scope of the conspiracy be discovered, was proper considering the instant facts, and the existing legal precedent.

### 2. November 4, 2009 Affidavit

SA Jeneary's November 4, 2009 affidavit in support of the extension of the wiretap of Target Telephone 1 provides the same information as the October 5, 2009 affidavit in regards to the investigative techniques tried and the investigative techniques considered, but which were not implemented.

The November 4, 2009 affidavit also explains why toll records are insufficient. Toll records do not provide to whom or from whom the calls are being made. Furthermore, SA Jeneary had determined that the prepaid cellular phones being used had no subscriber information or subscribers that appeared to be nominees or unwitting parties.

### 3. May 13, 2010 Affidavit

SA Jeneary's May 13, 2010 affidavit in support of the application for the wiretap of Target Telephone 1 is similar to the other affidavits. It lists the traditional investigative techniques that had been utilized: vehicle trackers, confidential sources, physical surveillance, obtaining cell detail and cell site records for Target Telephone 2, acquisition of precise location data for the Target Telephone 2, administrative subpoenas, and/or court orders. The affidavit also identifies traditional investigative techniques considered: trash pulls, grand jury investigation, interviewing subjects or

associates, the serving of search warrants, utilizing undercover officers, and controlled delivery of narcotics.

The vehicles trackers were unsuccessful in helping the agents determine the location of where the narcotics were being stashed. The targets would only use the vehicle for a short period of time before loaning it to another individual. Additionally, the installation of a vehicle tracker requires the agent to get near the target's vehicle, thus posing a heightened risk of detection.

The confidential sources used in the Victor Hugo Medina investigation were not associated with Defendant Amaya's organization. Additionally, DEA Detroit did not have any way of infiltrating the Amaya criminal organization with an undercover agent.

SA Jeneary represented that agents attempted to conduct physical surveillance, but that the meetings between coconspirators were typically brief and did not involve large amounts of prior planning, thus making it difficult for agents to observe the meetings.

SA Jeneary stated his belief that a trash pull would not likely succeed because, in addition to posing a larger than usual risk of detection because the location was a target's principal residence, the target utilized a location within an apartment complex that shared common trash dumpsters.

SA Jeneary considered convening a grand jury investigation, but determined that it would not be successful in exposing the full nature and scope of the criminal activity. As with search warrants and interviews, convening a grand jury would only alert the targets to the investigation, thereby jeopardizing the investigation.

The affidavit stated that eight search warrants had been executed seeking precision location data for cellular phones utilized by members of the organization, but the only information obtained through the warrants was where the cellular phone had been.

SA Jeneary stated that a controlled delivery of narcotics would not succeed in the investigation of the criminal organization because the controlled delivery would only supply agents with probable cause to search a limited area at a limited time. Doing so would frustrate the purpose of the investigation, which was to dismantle the entire criminal organization.

SA Jeneary concluded, based upon the toll analysis of the Target Telephones and other information, that the organization sold large quantities of narcotics, made large amounts of money, and covered a large area of geography. He represented to the court that only through the interception of wire communications could the full scope of the conspiracy be discovered. The Court agrees that Court approved wire communication intercepts were necessary to discover the full scope of the Amaya drug trafficking conspiracy.

### B.     Use of Interpreters

The May 13, 2010 Order authorized special agents of the DEA to intercept the wire communications, but did not explicitly state that the DEA agents could use interpreters. Thus, Defendants argue, the government violated the Order by using interpreters. The Order, however, states that "[i]n the event an intercepted conversation is in code or a foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization will be accomplished as soon as practical after the interception." 18 U.S.C. § 2518(5). This demonstrates the issuing judge's understanding, that as authorized under the statute, the DEA agents would have to use – make available – interpreters where necessary, and implicitly grants permission to do so. The governing statute, from which the above quoted language is taken, clearly establishes that contract interpreters are permitted. "An Interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a

contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception." 18 U.S.C. § 2518(5). That is exactly what happened here – contract interpreters acted under the supervision of the DEA law enforcement officers authorized to conduct the intercepts.

Defendants cite to *United States v. Lopez*, 300 F.3d 46 (1st Cir. 2002) for the proposition that the failure to disclose the intended use of contract civilian monitors provides a basis for suppression of the fruits of the interception by the non-government personnel.[3] *Lopez* is distinguishable from the present case because, in each affidavit, SA Jeneary "anticipated that all monitoring will be performed by police officers, detectives, contract interpreters/monitors, or DEA language specialists or agents . . . ." Thus, the government did disclose to the issuing judge its intention to use interpreters. Finally, the Court concludes that the First Circuit *Lopez* decision is an outlier, and this Court declines to follow it.

## C. Minimization

Defendants argue that the reports authored by AUSA Graveline in conjunction with the Title III Orders reflect an "utter lack of minimization." Defendants reach this conclusion by taking the total number of calls for each wiretap and dividing that number by the number of calls minimized for that wiretap. As discussed above, the total number of calls takes into account the initiation of a call even if the call does not result in two people speaking to one another or if a party does not leave a voicemail. Thus, the numbers Defendants cite provide an inaccurate percentage of

---

[3] Although the First Circuit stated that "Title III imposes an obligation on the government to disclose to the issuing judge any plans to use civilian monitors in the execution of a wiretap warrant", it concluded that "the government's failure to make that disclosure, along with the government's seeming violation of an order that did not permit the use of civilian monitors, does not provide a valid basis for suppressing the intercepted communications." *Id.* at 56.

9

minimized calls. Moreover, Defendants must do more than merely point to the percentage of calls minimized to establish insufficient minimization: "they must establish a pattern of interception of innocent conversations which developed over the period of the wiretap." *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985) (affirming the district court's overruling of the defendants suppression motion.).

Similarly, in *United States v. Giacalone*, 853 F.2d 470 (6th Cir. 1988), the defendants filed a suppression motion alleging that the government did not properly minimize the interceptions of calls. The district court had determined that the defendants failed to make a "sufficiently definite, specific, detailed and nonconjectural showing of a material issue of fact so as to justify an evidentiary hearing on the minimization issue." *Id.* at 482 (citations omitted). The Sixth Circuit noted that the defendants did not give any specific examples of conversations which should not have been monitored. The Sixth Circuit affirmed the district court's denial of an evidentiary hearing on the issue of minimization, noting that "the law is clear in this circuit that 'the burden of production and persuasion rests on the person seeking to suppress evidence.'" *Id.* (citing *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986)). The Sixth Circuit further stated:

> Moreover, the record shows that defendants did receive much of the information they sought regarding the scope of surveillance. In fact, defendants were provided with copies of all the wiretap applications and all the wiretap authorization orders, as well as the logs and the tapes made during the course of the electronic surveillance. In addition, the district court ordered the government to provide copies of transcripts of intercepted conversations that had been prepared. Because defendants had all the information they needed to make the minimization challenge if one were warranted, the district court clearly did not abuse its discretion in denying an evidentiary hearing when defendants failed to show that minimization may not have occurred.

*Id.* at 483.

The Court concludes that Defendants have not provided the required reason to prevail on the minimization argument.

### III. CONCLUSION

A review of the affidavits demonstrates that SA Jeneary informed the issuing judge of the difficulties involved in the use of conventional techniques as to warrant the authorization for the electronic surveillance. The government's use of contract interpreters did not violate the Order authorizing the electronic surveillance. Defendants have not offered sufficient evidence to warrant an evidentiary hearing regarding minimization.

IT IS SO ORDERED.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: 4-4-12